880 F.2d 348
 Harriet CORNELIUS, Plaintiff-Appellant
v.
TOWN OF HIGHLAND LAKE, ALABAMA, a municipal corp., Doug
Adams, Ind. and in his official capacity as the Mayor of
Highland Lake; W.D. Faust, Ind. and in his official
capacity as a member of the city council of the Town of
Highland Lake and as supervisor of the community work squad;
Larry Spears, Ind. and in his official capacity as Warden
of the St. Clair Correctional Facility; Carl Cain, Ind. and
in his official capacity as Sergeant of the St. Clair
Correctional Facility; David Mixon, Ind. and in his
official capacity as Classification Officer, Alabama
Department of Corrections; Craig McCoy, Ind. and in his
official capacity as Psychologist, Alabama Department of
Corrections; Ricky N. Fox, Ind. and in his official
capacity as a member of the Central Classification Review
Board, Alabama Department of Corrections; John Michael
Shavers, Ind. and in his official capacity as a member of
the Central Classification Review Board, Alabama Department
of Corrections; James DeLoach, Ind. and in his official
capacity as warden/representative Central Classification
Review Board, Alabama Department of Corrections; Elaine
Lewis, Ind. and in her official capacity as a member of the
Central Classification Review Board, Alabama Department of
Corrections; Freddie Smith, Ind. and in his official
capacity as Commissioner of the State of Alabama, Department
of Corrections, Defendants-Appellees.
 No. 88-7238.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 10, 1989.
Rehearing and Rehearing In Banc Denied Sept. 19, 1989.
 
 M. Jack Hollingsworth, Jerry O. Lorant & Associates, Birmingham, Ala., for Harriet Cornelius.
 John T. Harmon, Harry A. Lyles and Andrew Redd, Alabama Dept. of Corrections, Montgomery, Ala., for Carl Cain, David Mixon, Craig McCoy, Ricky Fox, John Shavers, James DeLoach, Elaine Lewis, Freddie Smith.
 James S. Lloyd, Clark & Scott, P.A., Birmingham, Ala., for Town of Highland Lake, Doug Adams and W.D. Faust.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before FAY and ANDERSON, Circuit Judges, and HENDERSON, Senior Circuit Judge.
 FAY, Circuit Judge:
 
 
 1
 The plaintiff-appellant, Harriet Cornelius, appeals the district court's order granting summary judgment in favor of the defendants-appellees, Town of Highland Lake, Alabama, several of its city officials, and various members of the Alabama Department of Corrections. Two prison inmates, while assigned to a community work squad program in Highland Lake, abducted Mrs. Cornelius from the town hall and terrorized her for three days. She brought this action pursuant to 42 U.S.C. Sec. 1983 (1982) alleging that the defendants violated her constitutionally protected liberty interests. In granting summary judgment, the district court ruled that the plaintiff failed to present a genuine issue of material fact regarding whether the defendants owed Mrs. Cornelius a duty to protect her from the criminal actions of work squad inmates in the Alabama correctional system. The court found that no special relationship existed between Mrs. Cornelius and the defendants or between her and the inmates which would create such a duty. Viewing the evidence in the light most favorable to Mrs. Cornelius, we find that the evidence presented establishes a genuine issue as to whether a special relationship existed between the defendants and Mrs. Cornelius and whether the defendants were aware that she faced a special danger from the work squad inmates. Thus, we hold that there is a triable issue regarding whether the defendants' conduct deprived Mrs. Cornelius of her fourteenth amendment rights in violation of Sec. 1983. We therefore reverse the district court's grant of summary judgment.
 
 I. FACTUAL BACKGROUND
 
 2
 The record reflects the following facts. In March, 1984, the Mayor of the Town of Highland Lake requested that the Alabama Department of Corrections provide the city with inmate labor for general maintenance, clearing and public works purposes.[1] Beginning in May, 1984, the St. Clair Correctional Facility in Odenville, Alabama provided the inmates for this community work program. According to the record, many community residents in Highland Lake opposed the use of inmate labor within the town and repeatedly voiced their concern to the town's officials. See R1-45 (Cornelius and Stedman affidavits). One method of opposition was the circulation of a petition in the community calling for an end to the unsupervised use of inmate labor. See R1-45 (Stedman affidavit).
 
 
 3
 St. Clair Prison's operational guidelines for community work squad supervisors provided that only inmates who were nonviolent property offenders and who were classified as minimum custody were to be assigned to work squads. The prison was to provide to the person transporting the inmates an inmate work card with a picture identification specifying each inmate's name, crime, prison term and custody status. The prisoners were picked up from St. Clair each work day at 7:00 a.m. and returned by 5:00 p.m.
 
 
 4
 An unarmed civilian member of the community employed by the town supervised the inmates while they were in Highland Lake. While working, the inmates had access to tools used for maintenance including axes, picks, machetes, knives and saws. The plaintiff asserts that the squad supervisor received no training in handling the prisoners and that he possessed neither the requisite skills nor the physical abilities to control them. See R1-45 (Lucas affidavit). The defendants however, maintain that the squad supervisor knew and understood the procedures for handling the inmates.
 
 
 5
 Newburn Ray Wilson was an inmate at the St. Clair prison in 1985 serving a sixty-six year sentence[2] for two separate counts of armed robbery. In January 1985, an institutional classification committee conducted a progress review on Wilson and reduced his custody status to minimum security I. The defendants state that the custody reduction was in accord with Department of Corrections policy and manuals, and was unanimous among the classification committee. According to the plaintiff, Wilson's custody status should not have been reduced. He had an extensive history of violent crimes, including assault and battery, as well as drug related and property crimes. See R1-45 (McCarthy and Parsons affidavits). Additionally, Wilson had at least four institutional misconduct entries in his prison records.
 
 
 6
 In August 1985, the prison Central Review Board denied Wilson's request to be transferred to either a minimum security honor farm or the state cattle ranch. The plaintiff asserts that Wilson was also denied participation in the Department of Corrections' external community service program and work release program. See R1-45 (McCarthy affidavit). However, in September, 1985, Wilson was approved for minimum security road squad work. See R1-45 (inmate interview record). He was then assigned to the community work squad in Highland Lake.
 
 
 7
 In 1985, Harriet Cornelius worked at the town hall as Highland Lake Town Clerk. On November 8th of that year, work squad inmates Wilson and Timothy Townsend[3] abducted Mrs. Cornelius at knife point from the town hall.[4] The inmates forced Mrs. Cornelius to surrender her car to them and accompany them in their flight across three states. They held Mrs. Cornelius hostage for three days during which time they terrorized her. The inmates threatened to sexually and physically abuse Mrs. Cornelius as well as kill her. Finally, they left her tied to a tree outside Columbus, Georgia. The authorities eventually apprehended Wilson and Townsend. The inmates pleaded guilty and were each convicted of two counts of first degree kidnapping.
 
 II. PROCEDURAL BACKGROUND
 
 8
 Mrs. Cornelius brought this suit under Sec. 1983 against the Town of Highland Lake, its Mayor, a member of the City Council who supervised the community work squad, the Warden of the St. Clair prison, a Sergeant of the prison, the Commissioner of the Alabama Department of Corrections, and six members of that Department who allegedly approved Wilson's custody reclassification and recommended that he be assigned to a community work squad. The plaintiff claims that these officials acted with gross negligence and deliberate indifference in violation of her constitutionally protected liberty interests under the fourteenth amendment.
 
 
 9
 Mrs. Cornelius alleges that the inmates were able to abduct her because the town and its officials, although aware that dangerous inmates were participating in the community work squad, failed to provide adequately trained and skilled officers to supervise the work squad inmates and failed to insure that only nonviolent property offenders worked in the community. She claims that the prison officials knew or should have known that inmate Wilson should not have been assigned to the work squad due to his prison record, that the prison was regularly assigning inmates convicted of violent offenses to the community work squad, and that the work squad supervisors had no training in corrections yet were supervising the violent criminals assigned to them by the prison.
 
 
 10
 The district court granted the defendants' motion for summary judgment holding that the defendants owed Mrs. Cornelius no duty to protect her from the criminal acts of the work squad inmates because no special relationship existed between Mrs. Cornelius and either the defendants or the inmates. Because the court found that the plaintiff failed to present sufficient evidence of a genuine issue as to whether a duty existed, it concluded that Mrs. Cornelius possessed no constitutionally protected right under the due process clause, and thus, no claim under Sec. 1983. In our review, we examine the issues of whether a special relationship or a special danger to the plaintiff could be found to have existed under the evidence as presented in this case and whether that relationship or danger would impose a duty upon the defendants to protect Mrs. Cornelius.
 
 III. STANDARD OF REVIEW
 
 11
 Consideration of the district court's grant of summary judgment requires plenary review and application of the same legal standards that bound the district court. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1527 (11th Cir.1987). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir.1987). The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof. Everett, 833 F.2d at 1510.
 
 
 12
 Summary judgment is improper "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir.1988). In this case, we view the evidence produced by Mrs. Cornelius, the nonmoving party, and all factual inferences arising from it, in the light most favorable to her. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Everett, 833 F.2d at 1510; Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir.1987). Considering these principles, we now turn to an evaluation of the substantive law governing this case to determine the propriety of the district court's order granting summary judgment.IV. ANALYSIS
 
 
 13
 To prevail in a civil rights action under 42 U.S.C. Sec. 1983[5] a plaintiff must show that the defendant, under color of state law, deprived the plaintiff of a right secured by the Constitution and laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); Everett, 833 F.2d at 1510; Dollar v. Haralson County, 704 F.2d 1540, 1542-43 (11th Cir.), cert. denied, 464 U.S. 963, 104 S.Ct. 399, 78 L.Ed.2d 341 (1983). Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2674 n. 3, 61 L.Ed.2d 433 (1979); Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir.1987). An underlying constitutional right must exist before a Sec. 1983 action will lie. Wideman, 826 F.2d at 1032. Accordingly, our inquiry focuses upon the nature of the plaintiff's constitutional right allegedly deprived by the defendants. Baker, 443 U.S. at 140, 99 S.Ct. at 2692.
 
 
 14
 A. Nature of Constitutional Right/Liberty Interest
 
 
 15
 Mrs. Cornelius alleges that the defendants deprived her of liberty and property rights secured by the due process clause of the fourteenth amendment. She asserts the right not to be injured in person or property by the state's gross negligence and deliberate indifference in failing to protect her from the actions of state inmates under the direct supervision of the state's agents.
 
 
 16
 The plaintiff states that the corrections officials owed her a duty to classify inmates properly to minimum custody status and to assign to community work squads only those inmates eligible for relaxed community supervision. Mrs. Cornelius alleges that these prison officials knew or should have known that inmate Wilson should not have been assigned to the work squad due to his prison record, that other inmates convicted of violent offenses were assigned to the community work squad, and that the community work squad supervisors had no training in corrections. Mrs. Cornelius claims that the Town of Highland Lake and its officials owed her a duty to provide adequately trained and skilled officials to supervise the inmate work squads, and to insure that only nonviolent property offenders worked in the community.
 
 
 17
 In this circuit, the existence of a special relationship between an individual and the state may trigger a constitutional duty on the state's part to provide protective services. Wideman, 826 F.2d at 1034. "In these special circumstances, the state's failure to provide such services might implicate constitutionally protected rights." Id. The body of law dealing with special relationships and whether certain facts sufficiently establish that a plaintiff may be entitled to relief under Sec. 1983 is a grey area at best. Id. at 1035. We therefore find it helpful to consider the relevant cases regarding special relationships and the duties created by them in order to analyze whether the defendants' conduct and the factual setting of this case do indeed sufficiently present a genuine issue arising under Sec. 1983 for the violation of Mrs. Cornelius' due process rights.
 
 1. Special Relationship
 
 18
 Courts use the special relationship analysis to find liability under Sec. 1983 in cases where a plaintiff seeks to hold the state responsible for the private actions of a third party. Under the analysis, government officials may be held liable for the deprivation by a third party of a private citizen's due process rights when a special relationship is found to exist between the victim and the third party or between the victim and the government officials. Wright v. City of Ozark, 715 F.2d 1513, 1515 (11th Cir.1983). When the duty which arises by virtue of the special relationship is coupled with some degree of culpable conduct on the defendant's part, Sec. 1983 liability attaches.[6] However, absent the relationship, "the due process clause of the Constitution does not protect a member of the public at large from the criminal acts of a third person, even if the state was remiss in allowing the third person to be in a position in which he might cause harm to a member of the public...." Id.
 
 
 19
 The United States Supreme Court considered the issue of governmental liability for third party actions in Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In Martinez, the Court held that the murder of a fifteen-year-old girl by a parolee five months after his release from prison did not subject the parole board to liability under Sec. 1983. Id. 444 U.S. at 285, 100 S.Ct. at 559. The Court found that the actions of the state did not "deprive" the victim of a constitutionally protected right. Id. It stated that the parolee was not an agent of the state, that the parole board did not know that the decedent, as distinguished from the public at large, faced any special danger, and that the death was too remote a consequence of the parole board's action to hold them responsible under the federal civil rights law. Id.[7] The Court, in considering remoteness, emphasized that the offender in the case was no longer in the custody of the state. Id. Thus, no Sec. 1983 claim existed because there was no nexus between the defendant's conduct and the plaintiff's alleged due process violation under the fourteenth amendment.
 
 
 20
 In Wright, this circuit followed the principles set out in Martinez regarding state liability for third party actions. In that case, a woman was raped by an unknown assailant within the City of Ozark. She brought a Sec. 1983 action against the city and several of its officials, alleging that they had deliberately suppressed information of prior rapes in the city so as not to jeopardize its business and commercial activities. She asserted that had she known of the prior rapes, she would not have been in the dangerous part of town where she was the night of the rape.
 
 
 21
 This court dismissed the action, holding that the defendants owed the plaintiff no duty under Sec. 1983 to protect her because no special relationship existed between her and either the defendants or the assailant. Wright, 715 F.2d at 1516. We noted that the offender in the case was an unknown assailant roaming at will within the city, outside of the city officials' custody. Additionally, the officials neither singled out the victim to be denied protection from the rapist nor were they aware of any special danger facing her. Id. at 1515. Thus, despite the plaintiff's allegation that the defendants acted purposefully and recklessly, absent the existence of a special relationship, no duty and therefore no Sec. 1983 liability arose.
 
 2. Special Danger
 
 22
 In addition to the special relationship approach, a plaintiff may also show a duty on the state's part under Sec. 1983 by establishing that the plaintiff, as opposed to the general public, faced a special danger. Wells v. Walker, 852 F.2d 368, 370 (8th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). The Seventh Circuit in Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982) clarified this analysis. In Bowers, the plaintiff's estate brought a Sec. 1983 action against various physicians and public employees claiming that the defendants knew that a mental patient was dangerous when they released him, and that they acted recklessly in doing so. The mental patient murdered the plaintiff one year after the defendants released him.
 
 
 23
 Despite the court's recognition of a state's duty in certain circumstances, it held that the defendants in the case owed no duty to the plaintiff because they did not place her in a position of danger nor were they aware that she faced a special danger distinguishable from that of the general public. Id. Although the court stated that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen," it also recognized that "[i]f the state puts a man in a position of danger and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Id. (emphasis added).
 
 
 24
 This circuit, in Jones v. Phyfer, 761 F.2d 642 (11th Cir.1985), recognized the special danger analysis. In that case, the plaintiff brought a Sec. 1983 action against state officials alleging that their failure to warn her of the release on Christmas furlough of a young man, who had been convicted and imprisoned for breaking and entering her home six months earlier, deprived her of her constitutional rights when the convict returned to her home and raped her. This court held that the plaintiff failed to establish a special relationship, noting that "there is no constitutional duty to protect members of the general public from random criminal violence unless a special relationship exists which imposes such a duty." Id. at 646. However, we acknowledged that a constitutional right to protection may exist when there has been some showing that the victim faced a special danger distinguishable from that of the public at large. Id. at 644-45. Other circuits have followed the special relationship/special danger reasoning in analyzing whether a constitutionally protected right is implicated in a Sec. 1983 action.[8]
 
 
 25
 The Sixth Circuit sitting en banc recently addressed this analysis in Nishiyama v. Dickson County, Tenn., 814 F.2d 277 (6th Cir.1987) in considering the limits of liability of government officials under Sec. 1983 for a murder committed by a person who was not a state official, but who was in the state's custody. In Nishiyama, an inmate in the custody of the sheriff's department often had unsupervised use of a county patrol car equipped with standard blue flashing lights and official identifying markings. The inmate was on "trusty" status and used the patrol car to perform official and personal tasks for himself, the sheriff and the deputy sheriff. During one unsupervised drive, the inmate roamed the highways of several counties and stopped motorists by flashing the patrol car's blue lights. The plaintiffs' daughter responded to the signals of the sheriff's patrol car driven that night by the inmate, and pulled to the side of the road. The inmate then approached the victim and beat her to death.
 
 
 26
 The court of appeals held that the plaintiffs stated a claim under Sec. 1983 for deprivation by the state of the victim's constitutionally protected interest in life. Id. at 281. Distinguishing the case from Martinez and its progeny, the court emphasized the custodial relationship between the inmate and the prison officials who gave the inmate the use of the vehicle. Id. at 280-81. In finding that the defendants' conduct implicated the plaintiff's constitutional rights, the court found persuasive the high degree of the officials' power and authority to direct the inmate's actions. Id. The court recognized that the custodial nature of the sheriff-inmate setting evidenced the proximity of the defendant's conduct to the ultimate deprivation of the victim's constitutional rights through the actions of the inmate.
 
 
 27
 With this background in mind, we must now determine if the evidence presented here could be found sufficient to establish the alleged constitutional claim against both the town and prison officials for their failure to protect Mrs. Cornelius from the harm inflicted by inmates Wilson and Townsend.
 
 
 28
 B. Application of Special Relationship/Special Danger Analysis
 
 
 29
 This case presents a factual framework unique to this circuit. In analyzing whether a genuine issue of material fact exists as to the constitutional duty of the various defendants, we first examine whether the town and its officials owed Mrs. Cornelius a duty to protect her from harm by the work squad inmates under the special relationship approach.
 
 
 30
 The evidence reflected in the record in this case, and the reasonable inferences drawn from it, indicate that there does exist a genuine issue precluding summary judgment regarding whether the plaintiff and the town officials stood in a special relationship with one another. Mrs. Cornelius was the Town Clerk for Highland Lake during the time the town utilized inmate labor for clearing and maintenance purposes. See R1-45 (Cornelius affidavit). Her duties as Town Clerk required her to work in the town hall building; the area where the inmates also regularly worked.
 
 
 31
 In her position as Town Clerk, Mrs. Cornelius routinely dealt with the Mayor and council member who were the direct liaisons with the prison officials concerning the inmate work squad program, and who actually supervised the inmates. Id. She was aware that the city officials repeatedly handled the complaints of concerned citizens regarding the work squad inmates by assuring them that only nonviolent property offenders comprised the community work squads. See R1-45 (Cornelius, Stedman and Walker affidavits). In this way, the town officials allayed the residents' fears, maintaining that little chance of inmate escape or other inmate related crime existed. See R1-45 (Cornelius affidavit).
 
 
 32
 These facts indicate that if Mrs. Cornelius wished to continue serving as the town clerk, she had to work in the environment created by the town officials; one that included routine exposure to prison inmates around the town hall. As Town Clerk, Mrs. Cornelius was required to submit to these conditions by her superiors, conditions well beyond the normal restrictive control inherent in an employer-employee relationship to which an employee agrees. The Supreme Court addressed this issue of state control in its most recent pronouncement concerning the use of the special relationship/special danger analysis to implicate constitutional duties under Sec. 1983, in DeShaney v. Winnebago County Dep't of Social Servs., --- U.S. ----, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).
 
 
 33
 In DeShaney, although the Court found that the state owed no constitutional duty to protect a child from the violent actions of his father, it did acknowledge that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through ... [a] restraint of personal liberty--which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." Id. 109 S.Ct. at 1006. The Court also found in denying liability, that despite the state's awareness of the child's dangerous predicament, the state "played no part in [its] creation, nor did it do anything to render him any more vulnerable to [it]." Id. at 1006. In this case, the defendants did indeed create the dangerous situation of the inmates' presence in the community by establishing the work squad and assigning the inmates to work around the town hall. Moreover, the defendants increased Mrs. Cornelius's vulnerability to harm by regularly exposing her to the work squad inmates by virtue of her position as Town Clerk. These actions, coupled with the degree of control the town officials exercised over Mrs. Cornelius as Town Clerk, lead us to conclude that there is a genuine issue relevant to the existence of a special relationship between the town officials and the plaintiff implicating her due process rights.[9]
 
 
 34
 In addition, the facts of this case more readily support the existence of a special relationship than did the facts in Martinez and Wright where the courts refused to find that the state's failure to provide protective services implicated constitutionally protected rights. Unlike the Martinez case and those following it where the third party actor causing the harm either was released from the officials' custody or was never in it, the work squad inmates here were convicted felons in the Alabama correctional system. Despite the inmates' temporary participation in the community work squad program outside the walls of the St. Clair prison, they still remained incarcerated prisoners in the state's penal system.
 
 
 35
 These inmates never assumed the status of parolee, releasee, furloughed inmate or unknown assailant as in Martinez, Bowers, Jones, and Wright. In such cases the remoteness of the defendants' conduct from the actual harm committed by an individual wholly outside of the custody and control of the state is too great to impose liability. However here, although the inmates eventually escaped from the custody of the defendants, at the time of the kidnapping they were still within the defendant's custody[10] and were in the community setting only by virtue of the defendants' actions in bringing them there. As in Nishiyama, this custodial relationship supports a finding that the defendants had the power and authority to direct the inmates' actions in a way that was absent in Martinez. See Nishiyama, 814 F.2d at 280. Such power and authority imposes a responsibility upon the state for its own actions. We therefore find that a reasonable fact finder could find facts which would indicate that Mrs. Cornelius and the town officials stood in a special relationship to one another, and that a corresponding duty on the state's part to protect her arose.
 
 
 36
 We now must determine whether the prison officials, as well as the town officials, could be found to have owed Mrs. Cornelius a duty to protect her from harm by the work squad inmates under the special danger analysis. The circumstances of this case present a factual scenario quite similar to that in Nishiyama. As in Nishiyama the plaintiff here has presented evidence that the work squad inmates were in the defendants' custody when Mrs. Cornelius was kidnapped, and that the defendants facilitated the inmates' commission of the crime by their conduct. We find these factors critical in determining whether the plaintiff has established sufficient evidence of the existence of a special danger and concomitant duty under Sec. 1983. As previously discussed, the nature of the defendants' conduct constitutes an important consideration in establishing their duty. See Escamilla v. City of Santa Ana, 796 F.2d 266, 269-70 (9th Cir.1986).
 
 
 37
 In this case, the evidence shows that the town and prison officials affirmatively acted together in bringing the inmates into the community of Highland Lake via the work squad program.[11] See R1-45 (Cornelius affidavit and minutes of 3/15/84 town meeting). These officials cooperated in implementing the work squad program. See R1-45 (Minutes of 3/15/84 and 5/17/84 town meetings); R1-29 (Cain affidavit). The St. Clair prison officials initiated the creation of the community work squad, reclassified the inmates for eligibility for community work, assigned the inmates to the work squad and allowed the town officials to supervise them. The town officials contacted the prison to obtain inmate labor, accepted the inmates assigned to them and undertook to supervise the inmates while they worked. The defendants in this case therefore affirmatively created a potentially dangerous situation. This situation, combined with the culpable actions of the prison and town officials and the status of Mrs. Cornelius as the town clerk, effectively operated to place her in a position of danger distinct from that facing the public at large. These conditions are what is required under Jones for a duty under Sec. 1983 to arise. Jones, 761 F.2d at 645.
 
 
 38
 An examination of the evidence presented in the record regarding the nature of the defendants' conduct reveals that their actions significantly increased both the risk of harm to the plaintiff, and the opportunity for the inmates to commit the harm. As in Nishiyama, the prison officials' established practice of assigning dangerous prisoners to the community work squads and entrusting their supervision to town officials with no training in handling prisoners, as well as the town officials' actions in assuming custody of the dangerous prisoners without the proper training, "set in motion the specific forces that allowed [the inmates] to commit [their] crime." Nishiyama, 814 F.2d at 281.
 
 
 39
 In Nishiyama, the court noted that the inmate remained in the sheriff's custody before, during and after the murder. The sheriff and his deputy authorized the inmate to use and have sole control over the patrol car for his private needs. When notified that a Dickson County patrol car was stopping motorists in Montgomery County, the officials did nothing, nor did they take any steps to prevent the inmate's use of the car for his private affairs at any other time. The court found that these actions enabled the inmate to use the apparent authority of the patrol car to direct the victim to stop her car and to kill her. Id.
 
 
 40
 The defendants here engaged in similar conduct. According to the evidence presented, the prison officials routinely placed violent prisoners on the work squads and the town officials accepted them into the community knowing of their dangerous propensities. The affidavit of the town resident who transported the inmates to and from the prison to Highland Lake supports this:
 
 
 41
 Each morning when I picked up the inmates at the St. Clair Correctional Facility I was given cards containing a photograph of the inmate and his criminal history.... This card was then delivered to [the work squad supervisor] along with the inmates who were placed in his custody upon my arrival at the Town of Highland Lake. Some of these cards indicated that the inmates were convicted violent offenders.... These offenders included those convicted of robbery, murder and rape.
 
 
 42
 R1-45 (Lucas affidavit). Inmate Wilson himself was a convicted armed robber serving a sixty-six year sentence at St. Clair. See R1-45 (McCarthy affidavit).
 
 
 43
 Once the inmates were transported to Highland Lake, a member of the town council supervised them while they worked. As the sheriff and deputy sheriff in Nishiyama authorized unsupervised use of the patrol car, the work squad supervisor, according to the affidavits of eyewitnesses in the community, would often allow the inmates to work with the maintenance tools "unsupervised and outside his presence." R1-45 (Cornelius affidavit). Mrs. Cornelius stated in her affidavit:
 
 
 44
 I have personal knowledge of inmates having visitors from the free world while at Highland Lake; having access to telephones; having access to knives, axes, machetes; I personally witnessed inmates driving the town car and also the personal automobile to [the work squad supervisor].
 
 
 45
 Id. Other members of the community confirmed that the inmates were authorized to have unsupervised access to weapons. See R1-45 (Lucas, Stedman and Walker affidavits). Moreover, they observed the inmates freely associating with acquaintances and visitors, roaming unsupervised throughout the town, using automobiles in and out of the town, loitering on private property and failing to perform their work tasks. Id.
 
 
 46
 These facts show a sufficiently close nexus between the defendants' actions and the resulting criminal actions of inmates Wilson and Townsend in abducting and terrorizing Mrs. Cornelius to create a triable issue as to special danger. The Sixth Circuit relied upon this nexus between the criminal acts and the defendants' acts under color of state law to distinguish Nishiyama from Martinez. Nishiyama, 814 F.2d at 281. The court determined that none of the cases following Martinez which denied liability under Sec. 1983 contained as close a third party-state nexus as that set out in the facts before it. Id.
 
 
 47
 In [those] cases the state officers possessed information that circumstances endangering the public existed. Yet in none of the cases did the state officers by their acts facilitate the crime by providing the criminal with the necessary means and the specific opportunity to commit his crime.... In the present case, the officers gave [the inmate] the car and the freedom to commit the crime.
 
 
 48
 Id. (emphasis in original). Likewise, the close connection between the defendants' culpable actions and the inmates' criminal actions distinguish the case before us from Martinez. The defendants here facilitated the kidnapping by providing Wilson and Townsend with knives, saws and machetes and by allowing them to roam freely around the town hall. The prison and the town officials gave the inmates the opportunity and the freedom to commit their crime.
 
 
 49
 Not only do these facts show that the defendants actions were highly culpable, they also show that the defendants were aware of the danger present from the community work squad inmates yet did nothing to alleviate or protect against the danger. In addition to the inmate work cards informing both the prison and the town officials that dangerous inmates were participating in the work squad program, and the numerous complaints by the community residents regarding the lack of supervision over the inmates, the defendants also knew of a prior escape by another inmate from the same Highland Lake work squad just three months before Mrs. Cornelius's abduction. The defendants did nothing in response to this danger to prevent another escape.
 
 
 50
 Although the prison officials were aware of the dangerous situation existing in the town caused by the inmates' presence there under inept supervision, and were aware of the seriousness of Wilson's criminal history and violent background, they nevertheless reclassified Newburn Wilson's custody status as minimum security I and assigned him to the Highland Lake community work squad. According to the record, Wilson had an extensive criminal history including convictions for assault, battery, drug related crimes and property crimes. See R1-45 (McCarthy and Parsons affidavits). He had at least four institutional misconduct entries in his record, the last being for possession of a knife or for a stabbing. See R1-45 (August, 1985 inmate progress review form). The town officials also were aware of Wilson's conviction for robbery and resulting sixty-five year prison sentence, from its review of Wilson's inmate work card.
 
 
 51
 This awareness on the defendants' part, and their actions in creating the dangerous work squad situation and in assigning the inmates to work in and around the town hall, resulted in the defendants' placing Mrs. Cornelius, unlike other members of the general public, "in a unique, confrontational encounter with [persons] whom [the plaintiff showed] exhibited violent propensities." Wells v. Walker, 852 F.2d 368, 371 (8th Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989).[12] As in Nishiyama, the defendants' practice here made individuals like Mrs. Cornelius "particularly vulnerable to potentially dangerous situations." Nishiyama, 814 F.2d at 280.
 
 
 52
 In Nishiyama, the court stated that the radius of harm from the criminal conduct was more defined than in the usual case where the identity of potential victims is difficult to ascertain, id., such as where a parolee has been out of police custody for a length of time or where an unknown assailant has never been in state custody. According to the court, the defendants in that case should have known that motorists in the vicinity who, out of respect for and fear of law enforcement vehicles respond to blue flashing lights, were at risk from the official's policy. Id. Similarly, the defendants here knew that the town employees working at the town hall, like Mrs. Cornelius, were at risk from the their culpable actions. Such individuals were well within the identifiable radius of harm known to the defendants. Thus, under the special danger approach as well as the special relationship approach, evidence exists that the defendants owed Mrs. Cornelius a duty to protect her from the harm they created. We therefore conclude that the plaintiff has presented sufficient evidence that could form a basis for a finding that the defendants were aware that Mrs. Cornelius faced a special danger from the work squad inmates, and that they affirmatively placed her in that dangerous situation.
 
 V. CONCLUSION
 
 53
 We find that the evidence presented, viewed in the light most favorable to the plaintiff, shows that there are genuine issues of material facts relevant to the existence of a special relationship between the defendants and Mrs. Cornelius, and relevant to the existence of a special danger facing her. As such, we conclude that the plaintiff has presented sufficient evidence of a duty owing to her by the defendants under Sec. 1983 implicating a right protected by the due process clause of the fourteenth amendment. Accordingly, we REVERSE the summary judgment entered by the district court and REMAND for further proceedings consistent with this opinion.[13]
 
 
 
 [1]
 Although the record is somewhat unclear regarding the exact location where the inmates worked while in the town, the minutes of the town council meetings show that at least initially, the inmates worked around the town hall building and grounds. See R1-45 (Minutes of 3/15/84 and 5/17/84 town meetings)
 
 
 [2]
 We note that a discrepancy exists in the record as to the exact duration of Wilson's prison term. The plaintiff's brief and the affidavit of the plaintiff's expert in institutional corrections both state that Wilson was sentenced to sixty-six years for armed robbery. However, the plaintiff's amended complaint and Wilson's prison work card show the term to be sixty-five years
 
 
 [3]
 The evidence presented in the record is silent as to the nature of inmate Townsend's criminal history and prison record
 
 
 [4]
 Three months earlier another St. Clair inmate had escaped from the same community work squad in Highland Lake. The record indicates that that inmate's female companion, with whom he was able to associate freely while in town, helped coordinate the escape. See R1-45 (Walker affidavit)
 
 
 [5]
 Section 1983 provides in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. Sec. 1983 (1982).
 
 
 [6]
 It is inescapable to us that any consideration of the factors relevant to the existence of a special relationship must take into account the nature of the defendant's culpable conduct. Often, the nature of that conduct helps form the basis of the special relationship which in turn establishes the nexus between the defendant's actions and the deprivation of the plaintiff's rights. See Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir.1982) (special relationship creating affirmative duty obligating the state to protect private citizens' safety and health may arise from state's conduct in placing citizen in position of danger or potential harm). Whether the defendant's conduct rises to the level of culpability required to establish a deprivation of constitutional rights under Sec. 1983 however, is a question for the jury
 
 
 [7]
 The Supreme Court in Martinez assumed, as the complaint alleged, that the defendants knew or should have known that the release created a clear danger of harm and that the defendants' actions were not only negligent, but reckless, willful, wanton and malicious. The Court disposed of the case however, under an agency analysis holding that the defendants did not deprive the plaintiff of a constitutionally protected right because the parolee's conduct was too remote to be attributed to the state. Martinez, 444 U.S. at 285, 100 S.Ct. at 559. The Court, therefore, did not reach the question of whether the plaintiffs adequately alleged that the degree of the defendants' culpable conduct, in failing to observe certain requisite formalities, violated the plaintiff's due process rights. Id. at 284 n. 9, 100 S.Ct. at 558 n. 9
 
 
 [8]
 See Commonwealth Bank & Trust Co. v. Russell, 825 F.2d 12, 14-17 (3rd Cir.1987) (no constitutional right to state protection where defendants did not know plaintiff faced any special danger); Carlson v. Conklin, 813 F.2d 769, 772 (6th Cir.1987) (no due process violation absent special relationship between criminal and victim or victim and state); Ketchum v. Alameda County, 811 F.2d 1243, 1247 (9th Cir.1987) (special relationship considerations include whether custodial relationship is created or assumed by state, whether state knows of specific risk of harm to plaintiff or whether state had affirmatively placed plaintiff in position of danger); Janan v. Trammell, 785 F.2d 557, 560 (6th Cir.1986) (no due process violation where plaintiff failed to show a special danger distinguishable from public at large stemming from parolee's release); Fox v. Custis, 712 F.2d 84 (4th Cir.1983) (section 1983 claim dismissed although court recognized that constitutional right and corollary duty may arise out of special custodial or other relationships created or assumed by the state); Humann v. Wilson, 696 F.2d 783, 784 (10th Cir.1983) (per curiam) (state action too remote from crime where no special relationship existed between plaintiff and parolee or parole officials)
 
 
 [9]
 See Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1035-36 (11th Cir.1987) (key concept triggering constitutional duty is exercise of dominion or restraint by state); Ketchum v. Alameda County, 811 F.2d 1243 (9th Cir.1987) (extent of defendants' control over plaintiff and degree of exposure to harm are two factors courts consider in defining parameters of special relationship)
 
 
 [10]
 One resident of Highland Lake who was an investigator for the District Attorney's Office in Oneonta, Alabama at the time of Mrs. Cornelius's abduction stated in his affidavit that "it was approximately thirty minutes before the prison notified the Blount County Sheriff's Department of the escape which greatly slowed and hampered our search efforts." R1-45 (Walker affidavit)
 
 
 [11]
 We recognize the beneficial aspects of community work squads and other such work release and prison extension programs, both for the community receiving the free inmate labor and for the prison in alleviating inmate idleness and in utilizing their resources to help the community within which the prison is located. However, the state officials responsible for creating and implementing these programs must be aware of the potential danger inherent in any situation where convicted felons are interacting with a community and its residents. When the state creates a potentially volatile situation and later learns, as here, that the situation has erupted into one of danger, it cannot close its eyes and ignore the consequences
 
 
 [12]
 In Wells, the court found no violation of the victim's due process rights because the plaintiffs' allegations regarding the defendants' conduct stated a claim for negligence at most. Wells, 852 F.2d at 371. However, the court concluded that the actions of the Department of Corrections in providing transportation for a released prisoner to the plaintiff's store as the closest commercial transportation pick-up point, did show the existence of a special danger facing the plaintiff. Id. Thus, these actions invoked a constitutional claim against the defendants for their failure to protect the plaintiff from harm by the released prisoner. Id
 
 
 [13]
 We recognize that the defendants in this case raised the issue of qualified good faith immunity in this court. However, since the district court neither addressed this issue nor relied on it in rendering the summary judgment, we do not review the issue here