**James A. SUMMAR, on behalf of his deceased son, James A. SUMMAR, II and as next friend of the minor child, James Blank Summar, Plaintiff–Appellant,**

v.

**Ben BENNETT, individually and in his official capacity as an officer of the Rutherford County Sheriff's Department; Sheriff's Department of Rutherford County, Tennessee; Rutherford County, Tennessee, Defendants–Appellees.**

No. 97–5927.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 4, 1998.

Decided Oct. 14, 1998.

---

Wesley M. Oliver (argued and briefed), Lionel R. Barrett, Jr. (briefed), Nashville, TN, for Appellant.

David Randall Mantooth (argued and briefed), Leitner, Williams, Dooley & Napolitan, Nashville, TN, for Appellees.

Before: KRUPANSKY, NORRIS, and SILER, Circuit Judges.

## OPINION

KRUPANSKY, Circuit Judge.

This case presents an appeal by James A. Summar ("Plaintiff") on behalf of his deceased son, James A. Summar II ("Summar"), and as next friend of his grandchild James B. Summar, a minor. Summar served as a confidential informant to the Rutherford

County, Tennessee, Sheriff's Office until his death three or four days after Officer Benjamin Bennett ("Bennett") disclosed Summar's identity to the Rutherford County District Attorney's Office to assist in its preparation of a pleading against a criminal suspect about whom Summar had gathered evidence. Following his death, Plaintiff sued Bennett, the county, and the sheriff's office. The district court dismissed the complaint. Plaintiff has alleged that the district court committed reversible error when it resolved this cause because it concluded that a police officer who publicly discloses the name of a confidential informant is entitled to qualified immunity for the injury or death that occurs to the informant subsequent to that disclosure.

In June 1994, Bennett arrested Summar for his alleged possession of marijuana. After some discussion, Summar expressed an interest in serving as a confidential informant for the sheriff's office in exchange for Bennett's promise to advise the district attorney's office of Summar's cooperation, and to recommend that it "not pursue other members of the Summar family." J.A. at 15. On July 1, 1994, Summar executed a confidential informant information sheet. This document indicated Summar's understanding that his status as a confidential informant would be conditioned upon his willingness to wear a recording device, including a body wire, and to testify in open court.[1] See J.A. at 48. Subsequently, Bennett requested that Summar assist the sheriff's office in several investigations of drug trafficking.

When Bennett asked Summar to aid in the investigation of Michael Rhodes ("Rhodes"), Summar refused, explaining that he "had a close personal relationship with that individual." J.A. at 16. In a deposition conducted in preparation for this case, Bennett elaborated by noting that Summar had "stated that he informed Mr. Rhodes of the [sheriff's office] request for assistance in the investigation and Mr. Rhodes responded, 'Do what you've got to do, but leave me out of it.'" J.A. at 16.

Despite his reluctance to participate in the investigation of Rhodes, Summar agreed to assist Bennett in his investigation of an ac-

quaintance of Rhodes named Wayne Cartwright ("Cartwright"). Similarly, Summar agreed to assist the sheriff's office in its investigation of a drug trafficking suspect named John Wray ("Wray"). After Summar purportedly engaged in repeated but unsuccessful attempts to purchase illegal drugs from Wray, Bennett "determined that Mr. Summar was not making an effort to make such purchases. At about the same time, Mr. Summar ceased making telephone calls to [Bennett, who] interpreted Mr. Summar's lack of cooperation as an abandonment of his agreement to serve as a confidential informant[.]" J.A. at 43.

On September 19, 1994, Summar's plea agreement with the district attorney's office was approved by the court. At that time, Summar purportedly informed Bennett "that he was not going to honor his agreement to testify against ... Cartwright." J.A. at 43. Three months later, on December 12, 1994, Bennett provided information to the district attorney's office to assist its preparation of charges against Cartwright, including the name of his informant. David L. Puckett, Esq. ("Puckett"), an assistant district attorney, prepared the indictment. The charges specifically observed that one "James A. Summer [sic]" had purchased drugs from Cartwright. J.A. at 52.

The indictment was served on Cartwright on May 21 or 22, 1995. Summar was killed by a gunshot wound to the neck three or four days later. See J.A. at 17.

On February 19, 1997, Plaintiff filed the instant complaint in federal district court alleging that the actions of Bennett, the sheriff's office, and the county had deprived Summar and his family of certain rights, in violation of 42 U.S.C. § 1983 and various supplemental state laws. Plaintiff alleged that after Cartwright became aware that Summar had served as a confidential informant in the case mustered against him by the county, he directed Rhodes and an accomplice named Larry Brumit to murder Summar. Plaintiff also specifically averred that the actions of the defendants presented a deliberate failure to protect Summar's safe-

---

1. Once Summar's duties as an informant ceased, his status would transform into that of a govern-

ment witness, and his confidentiality would thereafter disappear.

ty and identity despite the foreseeable risk to his life once his status as an informant became public. *See* J.A. at 9. Accordingly, Plaintiff sought compensatory and punitive damages.

In the only ruling relevant to this appeal, the district court dismissed the complaint against Bennett in his individual capacity on the basis of his qualified immunity. Although the trial court expressed agreement with a New Jersey district court that a "special relationship" is created when law enforcement officers and a confidential informant "anticipate that the informant's activities, if discovered, could result in a threat to the life of the informant," *G–69 v. Degnan,* 745 F.Supp. 254, 265 (D.N.J.1990), it nevertheless resolved that at the time Bennett caused Summar's name to be included in Cartwright's indictment, Bennett's purported duty to protect Summar pursuant to their special relationship premised upon this legal theory had not yet been clearly established. *See* J.A. at 26. Accordingly, the district court found Bennett insulated by qualified immunity for his failure to protect Summar from the foreseeable danger which ended his life.

▬ Because the doctrine of qualified immunity is a legal issue, this court must review *de novo* its application by the district court. *See Cagle v. Gilley,* 957 F.2d 1347, 1348 (6th Cir.1992). Moreover, this court is required to examine *de novo* all appeals from motions for summary judgment which an initial forum has allegedly improperly granted. *See EEOC v. University of Detroit,* 904 F.2d 331, 334 (6th Cir.1990). Like the district court, it must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In performing this assignment, the court must "draw all justifiable inferences in favor of the non-moving party." *Winningham v. North Am. Resources Corp.,* 42 F.3d 981, 984 (6th Cir.1994). Nevertheless, the existence of a mere scintilla of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505 (1986). At least one genuine issue of material fact must exist. *See Middleton v. Reynolds Metals Co.,* 963 F.2d 881, 882 (6th Cir.1992). A fact is material if it will "affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

"Suits for monetary damages are meant to compensate the victims of wrongful actions and to discourage conduct that may result in liability." *Forrester v. White,* 484 U.S. 219, 223, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988). Despite these laudable goals, the threat of liability may also create perverse consequences, especially when it confronts certain public officials, because their decisions will often necessarily affect others adversely. *See id.* Naturally, the threat of liability to such officials may induce them "to act with an excess of caution or otherwise to skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct." *Id.* To prevent this unintended and unfortunate consequence, the Supreme Court has developed a body of decisional law which shields certain official conduct within the panoply offered by "qualified" and "absolute" immunity. *See, e.g. Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

▬ In *Harlow,* the Supreme Court confronted the particular brand of immunity presently before the court, and explained that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. "That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635,

640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Informed by these legal precepts, this court has elected to analyze disputes over qualified immunity in two steps: "[T]he first step is to determine whether plaintiff has shown a violation of a constitutionally protected right. If the answer is yes, then the second step is to determine whether the right is so 'clearly established' that a 'reasonable official would understand that what he is doing violates that right.'" *Brennan v. Township of Northville,* 78 F.3d 1152, 1154 (6th Cir.1996).

■ Ordinarily, to conclude that a constitutional right has been "so 'clearly established' that a 'reasonable official would understand that what he is doing violates that right,'" 78 F.3d at 1154, a district court within this circuit must "find binding precedent from the Supreme Court, the Sixth Circuit, or ... itself." *Cagle,* 957 F.2d at 1348. Sometimes, the decisions of other courts can also clearly establish the law; but they must "point unmistakenly to the unconstitutionality of the conduct and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Id.* Related to this principle is the notion that the absence of a case directly on point does not automatically endow an official defendant with the shield of qualified immunity. In *Walton v. City of Southfield,* 995 F.2d 1331 (6th Cir.1993), for example, this court generally explained that "[t]he right to be free from excessive force is a clearly established right," yet affirmed a district court's denial of qualified immunity on the specific question of "excessive force in handcuffing" without citing a single case dealing with a similar factual scenario. *Id.* at 1342. Nevertheless, when this court can uncover only some generally applicable principle, its specific application to the relevant controversy must again have been "clearly foreshadowed by applicable direct authority." *Cagle,* 957 F.2d at 1348.

■ In the present dispute, Plaintiff has endeavored to benefit from the "clearly foreshadowed" foreign decision exception to this court's general requirement that there exist clearly established binding authority as a condition precedent to the rejection of qualified immunity. Specifically, Plaintiff has cited several foreign cases, each of which has purportedly concluded that government officials have a duty to protect certain private citizens from a third party's deprivation of their due process rights when a special relationship exists between the victims and the government officials. *See, e.g.,* *K.H. Through Murphy v. Morgan,* 914 F.2d 846, 849 (7th Cir.1990) (explaining that when a state removed a child from parental custody due to her alleged subjection to sexual abuse, it assumed a duty not to place her in a position of danger by an abusive foster parent); *Cornelius v. Town of Highland Lake, AL,* 880 F.2d 348, 355–56 (11th Cir.1989) (noting that where public officials created a dangerous situation by establishing an inmate work program in the community, a special relationship was created between the state and a private individual whose occupation required her to work in close proximity to the inmates, thereby endowing the officials with a duty to protect her from the inmates); *Wood v. Ostrander,* 879 F.2d 583, 588 (9th Cir.1989) (observing that when a police officer arrested the driver of a car, impounded it, and left a lone female passenger "by the side of the road at night in a high-crime area," the officer had a duty to protect the woman from danger).

It is critical to note that in each of these cited cases, the official defendants created the risk of harm to the plaintiff without the consent of the victim. In *K.H. Through Murphy,* state-funded child welfare workers placed an infant into the care of abusive foster parents. *See* 914 F.2d at 848. In *Cornelius,* prison and town officials imposed the use of inmate labor within a town, and over the victim's objections routinely exposed her to the dangerous presence of inmates in her preexisting work routine. *See* 880 F.2d at 355. In *Wood,* the police officer abandoned the victim "by the side of the road at night in a high-crime area," despite her entreaties for help, following the arrest of the individual with whom she had been traveling. 879 F.2d at 588. Accordingly, the present controversy can be distinguished from the others because Summar voluntarily elected to serve as a confidential informant, despite being advised that he would have to testify and reveal his status as an agent of the police. *Cf. K.H. Through Murphy,* 914 F.2d

at 849 (noting that the state is not responsible "for a child's *voluntary* placement by the natural parents in an abusing private foster home").

Despite this critical distinction, Plaintiff has urged this court to recognize that *G–69*, a case which was relied upon by the district court, provided an adequate basis for clearly proving that where government officials enter into an agreement to employ a confidential informant, and "both parties anticipate that the informant's activities, if discovered, could result in a threat to the life of the informant," the government "affirmatively assume[s] a duty" to protect the informant's life. 745 F.Supp. at 265. Because *G–69* is the only case to recognize that legal principle, Plaintiff must persuade this court both that it the underlying legal precept is correct, as the district court concluded, and that it was "clearly foreshadowed by applicable direct authority" which also binds this court. *Cagle*, 957 F.2d at 1348. To satisfy these objectives, Plaintiff has cited *DeShaney v. Winnebago County Department of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

In *DeShaney*, the Supreme Court resolved that a group of social workers and public officials had not violated the Due Process Clause or the Eighth Amendment by failing to remove a child from his physically abusive father. *See id.* at 196–200, 109 S.Ct. 998. The Court explained that "when the State by the *affirmative exercise of its power* so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action" set by the Constitution. *Id.* at 200, 109 S.Ct. 998 (emphasis added). The Court observed that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help

him, but from the limitation which *it has imposed* on his freedom to act on his own behalf." *Id.* (emphasis added). Without question, this exposition of the law clearly foreshadowed the correctly reasoned results in *K.H. Through Murphy*, 914 F.2d at 848 (state workers put infant in harms way), *Cornelius*, 880 F.2d at 355 (government officials used inmate labor in close proximity to woman's daily routine), and *Wood*, 879 F.2d at 588 (police officer abandoned the victim "by the side of the road at night in a high-crime area"), for in each of these instances the state affirmatively acted to impose a limitation on the freedom of the victims to act.

In the instant action, Summar voluntarily agreed to serve as a confidential informant, albeit "motivated by Officer Bennett's promises regarding the decedent's pending drug charge." J.A. at 28. As the district court observed, Bennet merely "asked him" to serve as an informant, J.A. at 28, and did not "impose[ ]" any constraint "on his freedom to act," *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. Rather than strip Summar of his choices, Bennett provided him with an option that would allow him to be treated favorably by the district attorney regarding his pending drug charges, and provide some security for any of Summar's family members who were similarly engaged in unlawful activities. Accordingly, this forum does not adopt the proposition of law articulated by the New Jersey district court in *G–69*, and notes that *DeShaney* neither compels nor foreshadows the conclusion pronounced in that renegade decision.[2] *See id.* ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf ... which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act

---

**2.** In a recently decided case, *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir.1998), this court observed that a state may be liable for "increas[ing] the risk that an individual will be exposed to private acts of violence," even where the state did not create the risk. *Id.* at 1066. At oral argument, it was suggested that this precedent might assist Plaintiff's appellate claim. The court rejects that proposition because Bennett's act of assisting Puckett in his preparation of the

indictment did not "substantially increas[e] the likelihood that a private actor would deprive [Summar] of [his] liberty interest in personal security," as *Kallstrom* requires. *Id.* at 1067. Summar's voluntary decision to become a confidential informant with all the dangers it presented, not to mention his poor decision to fraternize with criminals in the first place, played a much greater role in his unfortunate demise.

to protect his liberty interests against harms inflicted by other means.").

To the extent that the district court reached a contrary conclusion its judgment is **REVERSED.** In all other respects the judgment is **AFFIRMED.**