Walter GALLOWAY and Mrs. Carol Galloway, Plaintiffs-Appellants,

and

State of Louisiana Through the Division of Administration, Office of Risk Management, Intervenor-Appellant,

v.

STATE OF LOUISIANA and Department of Corrections, et al., Defendants-Appellees.

No. 86–3640

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

May 29, 1987.

---

S. Michael Cashio, Kenner, La., for Galloway.

Gerald Jeffers, Baton Rouge, La., for intervenor-appellant.

J. Marvin Montgomery, Asst. Atty. Gen., Baton Rouge, La., for State of La.

Before REAVLEY, JOHNSON and DAVIS, Circuit Judges.

REAVLEY, Circuit Judge:

Appellant Walter Galloway, a former correctional officer at Washington Correctional Institute (WCI), brought this civil rights suit against appellees C. Paul Phelps, Secretary of the Louisiana Department of Corrections, Steve Alford, former Warden of WCI, Ricky Leonard, a correctional officer at WCI, and Walter Warren, also a correctional officer at WCI, for damages arising out of injuries he received in an altercation with an inmate, and his subsequent termination. Galloway's wife also brought a claim against appellees for loss of consortium. After extensive discovery, appellees moved for summary judgment, contending that Galloway uncovered no evidence, and could specify no facts that would support his sections 1983, 1985, 1986, and 1988 claims. The trial court granted appellees' motion to dismiss Galloway's federal claims. We affirm.

## I

From March 11, 1982 to June 23, 1983, Galloway was a correctional officer at Louisiana State Penitentiary (Angola). Galloway sought and received on June 23, 1983, a transfer from Angola to WCI. At WCI Galloway was assigned to work in cellblock M-4, designated as administrative lockdown. Cellblock M-4 lies adjacent to the isolation cellblock, M-3, and each contains two rows of cells placed back to back, with each row containing 13 cells.

On February 21, 1984, Galloway was the only guard on cellblock M-4, when inmate E. Boudray was to be transferred from M-3 to M-4. Three prisoners were housed on M-4 on that day. Officer Ralph Bennett removed Boudray from his cell on M-3 and turned him over, handcuffed, to Lt. C. Dixon. Dixon escorted Boudray down to cellblock M-4 where he turned him over to Galloway. Galloway walked the inmate to the gate leading to the left tier of M-4 as Dixon left the cellblock. A fight broke out between Boudray and Galloway, and Dixon returned to intercede. Following the incident, Boudray, Galloway, and Dixon were examined at the WCI infirmary. Medical personnel at WCI found that Boudray had sustained substantial injuries and opined that excessive force had been used against him. The infirmary's staff believed Galloway's injuries were not severe, and he was released from treatment.

Galloway claims, however, that he received insufficient medical attention at WCI, and had to go to a local emergency room for treatment. Galloway further argues that far from being insignificant, the injuries he received in the fight with Boudray have rendered him permanently disabled.

Galloway alleges that appellees "consciously" and with wanton disregard for his personal safety, conspired to have him work alone on cellblock M-4. He contends that appellees so conspired because he was an "outsider" (having transferred from Angola), and was not part of the appellees' "clique."

Three days after the incident with Boudray, Galloway was cited in a Louisiana Department of Corrections Employee Rule Violation Report, the so-called "DR-1," for violation of disciplinary rule 3-C, use of excessive force. At the DR-1 stage, an employee is entitled to a comprehensive review procedure, involving a first level hearing, a second level hearing, and a third

level hearing; and subsequent to these three levels of review, an aggrieved employee has the right to appeal to the Civil Service Commission. According to appellees, Galloway failed to take advantage of the first level of review. Galloway complains, however, that he was unable to be at the hearing because he was in the hospital at the time.

On March 5, 1984, Galloway was verbally suspended from the Department of Corrections, and on March 20, he received a letter from Phelps informing him that he was to be suspended, effective March 27, 1984, pending the results of further investigation. The letter informed him that he had a right to appeal the suspension to the Civil Service Commission, which he did by a letter dated April 18, 1984. On April 19, Galloway was informed that he would be terminated effective April 30, for use of excessive force on inmates, and that this termination was appealable to the Civil Service Commission. On November 8, 1984, the State Civil Service Commission voted, pursuant to the request of the Department of Corrections, to rescind Galloway's termination. Galloway was reinstated with full back pay retroactive to the date of his suspension, subject to an offset for wages earned and unemployment benefits received. In addition, all evidence of the disciplinary action taken against him was to be removed from his personnel files.

Galloway was informed of his reinstatement, and he responded in a letter dated October 23, 1984, that he wished to retain his position at WCI, but because of medical reasons was not certain when he could return to work. On December 19, 1984, Galloway was informed that he was to be terminated pursuant to Civil Service Rule 12.10 for exhaustion of sick leave. In the letter he was further informed that he would continue to receive worker's compensation, that he would be considered for re-employment when he returned to good health, and that he could appeal the proposed action to the Civil Service Commission. Galloway filed an appeal but later withdrew it in accordance with an agreement he reached with the Department of Corrections.

## II

### Claims Under Section 1983

Galloway invokes 42 U.S.C. § 1983 for two of his claims against appellees. First, he alleges that appellees' actions toward him were "conscious" or "indifferent," as well as "malicious and reckless," and resulted in the deprivation of his rights. Second, Galloway complains of a procedural due process violation arising out of his dismissal from WCI. We consider these claims in turn.

### 1. Claims of Conscious Indifference

■ The gravamen of Galloway's first section 1983 allegation is the fact that he was assigned to work alone on unit M–3, at a time when appellees were under a federal court order which required at least three men to be assigned to each of the disciplinary units, M–3 and M–4. Galloway's arguments are vague about what he considers to be the violation of his rights guaranteed by the United States Constitution. The court order directed remedies to correct Eighth Amendment violations for the benefit of the prisoners. Even for prisoners there is an important difference between constitutional rights, and remedies enforcing those rights. *Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir.1986) (citing *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384, 38 S.Ct. 501, 504, 62 L.Ed. 1171 (1918) ("the distinction between rights and remedies is fundamental")). As this court stated just recently, although "remedial decrees are the means by which unconstitutional conditions are corrected ... they do not create or enlarge constitutional rights." *Green*, 788 F.2d at 1123. Nor do judicial decrees create rights secured by laws within the meaning of section 1983. *Id.* Therefore, "a remedial court order, standing alone, does not serve as the basis for § 1983 liability." *Id.* at 1124.

■ Galloway argues, however, that appellees had a "hit-list" of disfavored employees who disproportionately were made to work alone on the dangerous M–3 and M–4 units. As we understand Galloway's

brief, he and others in this "out-group" were given these dangerous assignments while guards in the "in-group" did not work alone on these units. He argues that this intentional conduct, performed with "malicious and reckless" disregard for his safety, coupled with the fact that appellees repeatedly violated the court decree, created a genuine issue for trial. In particular, he contends that these facts demonstrate that appellees abused their power as public officials. *See Love v. King,* 784 F.2d 708 (5th Cir.1986) (applying "abuse of power" standard to determine whether a tort committed by a state official rises to the level of a constitutional tort). Even if he has alleged a constitutional tort against one who was a prison guard, he did not raise an issue of fact to resist summary judgment.

With their summary judgment motion appellees attached affidavits that categorically denied the existence of a "hit-list," or any other policy of singling out a group or individual for unequal treatment. Under Federal Rule of Civil Procedure 56(c), Galloway was obligated to meet this *prima facie* showing, and demonstrate a genuine issue for trial. Yet after a year of extensive discovery, Galloway failed to uncover a "hit-list," or *any* other evidence to support his allegation that appellees scheduled him for dangerous duty because of some personal animosity.[1] The trial court properly granted appellees' motion for summary judgment as to this issue. *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

### 2. Procedural Due Process Claim

■ In *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), the Court held that a state conferred property interest in continued employment cannot be deprived without due process of law. The

Court found that prior to terminating a public employee the employer must provide a hearing. The hearing need not be elaborate, however.

> The essential requirements of due process ... are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

105 S.Ct. at 1495 (citations omitted).

Galloway does not claim that appellees failed to provide notice and an opportunity to respond prior to his termination; he claims only that he was in the hospital at the time and could not respond to the charges. But, the record unequivocally demonstrates that Galloway, not appellees, was responsible for the lack of a pretermination hearing. While in the hospital, Galloway wrote a letter stating that he would request a first level hearing after he was released. Subsequently, however, he never requested one, and instead sought, in a letter dated March 12, 1984, an investigation into the issuance of the DR–1. Although he understood the available disciplinary procedures—as demonstrated by the March 12 letter—he opted to forego the graduated level of review by requesting an investigation. An employee cannot ignore the process duly extended to him and later complain that he was not accorded due process.

### Claim Under Section 1985

Galloway also contends that appellees conspired to deprive him of the equal protection of the laws in violation of 42 U.S.C. § 1985(3). Appellees' conspiracy was motivated, according to Galloway, by the fact that he transferred to WCI from Angola,

---

1. The most obvious piece of evidence that would support Galloway's allegations would be data on the number of times guards in the "out-group" worked alone on units M–3 and M–4 compared to the number for guards in the "in-group." Galloway states that "the WCI administration records will show consistently that Mr. Gallo-

way was working on a daily basis alone." But he fails to provide any statistical comparisons whatsoever that might support his allegation of unequal treatment. Galloway's conclusory allegations obviously are not enough to defeat appellees' motion for summary judgment.

and was not a member of the "in-clique." Galloway believes that he thus suffered "class-based" discrimination that is actionable under section 1985(3).

 It is well-settled law that the discriminatory animus behind an alleged violation of section 1985(3) must be racially based or in some other way class-based. *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). But not all classes or categories of individuals that can be imagined merit section 1985(3) protection. A plaintiff must show membership in some group with inherited or immutable characteristics (e.g., race, gender, religion, or national origin), or that the discrimination resulted from the plaintiff's political beliefs or associations. *Kimble v. D.J. McDuffy, Inc.*, 623 F.2d 1060, 1066 (5th Cir.1980). The class of which Galloway claims to be part does not fall within either of these two specially protected categories. Galloway, therefore, has not stated a cause of action under section 1985(3).[2]

We conclude, therefore, that the trial court properly granted appellees' motion for summary judgment, and also properly dismissed Galloway's state law claims without prejudice. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

AFFIRMED.

---

**2.** Galloway also asserts a claim under 42 U.S.C. § 1986, which provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 ... are about to be committed, and having power to prevent or aid ... neglects or refuses so to do." In the absence of a claim under section 1985, Galloway obviously cannot sustain a claim under section 1986. In the same way, Galloway's section 1988 claim must fail since he has not sustained a claim under sections 1983, 1985, or 1986, as required by the Act.