**Sang S. PARK, et al., Plaintiffs,**

v.

**CITY OF ATLANTA, et al., Defendants.**

**Civil Action No. 1:93–CV–0952–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 28, 1996.

Furman Smith, Jr., Larry James White, Smith, White, Sharma & Halpern, Atlanta, GA, for Plaintiffs.

Overtis L. Hicks Brantley, Karen Eleice Woods, Office of Atlanta City Attorney, Atlanta, GA, for Defendants.

*ORDER*

FORRESTER, District Judge.

This matter is before the court on a variety of motions, including cross-motions for summary judgment, [43–1, 45–1], Defendants' motion to correct factual misstatements made by Plaintiffs [62–1], and Defendants' motion to strike or in the alternative to object to the affidavit of Harold B. Goldhagen [61–1].

## I.  STATEMENT OF FACTS

This action stems from one of the despicable acts of mob violence which occurred in the tumult of the riots in Atlanta, Georgia, in the wake of the Rodney King verdict, which was rendered in Los Angeles, California, in late April of 1992.  On April 29, 1992, after a verdict of acquittal in the trial of several white police officers who were accused of unlawfully beating a black suspect, Rodney King, students from the Atlanta University Center began an impromptu march to the Richard B. Russell Federal Building and then to the State Capitol Building.  The first day's demonstrations ended at the State Capitol after 2 a.m.  The students, presumably tired but clearly still agitated, returned to the Atlanta University Center.

### A.  *The Assurances From The City of Atlanta—The Abuse Of The Plaintiffs*

The businesses of the Plaintiffs were to become a focus of the disorder on the second day of the riots.  Sang S. Park and Hi Soon Park owned and operated Five Star Supermarket, a grocery business located at 653 Fair Street, S.W., Atlanta, Georgia.  Plaintiffs Kwang Jun No and Jin Soon No owned and operated Star Liquor Store, a package store located next door at 661 Fair Street, S.W.  Both Korean–American–owned businesses were located in a small commercial area in the immediate vicinity of four historically black universities:  Clark Atlanta University, Spelman College, Morehouse College and Morris Brown College ("the Atlanta University Center").  Plaintiffs' stores were the only non-black-owned businesses within that area.[1]

In the afternoon of April 30, 1992, a group of students swarmed off the campuses of the Atlanta University Center.  A segment of the crowd headed to the downtown business district, where they looted and attacked white pedestrians.  A gang of students stopped to shout racial epithets and break the windows of both the Five Star Supermarket and the Five Star Liquor Store.  Glenn Park, who is the son of Plaintiffs, was working at the store; he relayed these events to a police officer.

On the following day around 1:30 or 2:00 p.m., students at the Atlanta University Center began to throw projectiles from windows of a dormitory at the corner of Brawley Avenue and Fair Street, which is located about three blocks from Plaintiffs' stores.  A police S.W.A.T. team used tear gas to disperse these students.  Throughout the day,

---

1.  The only other Korean establishment was the Home Box Buffalo Wings located two blocks east at the intersection of Fair and Northside Drive. Parks Aff. at ¶ 5.

Glenn Park talked with police officers both inside and outside of Plaintiffs' grocery store who assured him that Plaintiffs were safe and did not need to leave their stores. *See* Park Aff. at ¶¶ 18–27. At 4:30 p.m., Plaintiffs again went out onto the street to talk with the police officers who advised them not to leave and that the crowd would be contained at the Atlanta University Complex. The Plaintiffs decided to close their stores and congregate in an upstairs apartment within the Five Star Supermarket as nearby police officers observed.

At 6:15 p.m., Mayor Jackson held a press conference at City Hall in which he made a direct appeal to the students to stop the violence. In part the Mayor stated:

... the events that have taken place today here in Atlanta and within the last two days are not acceptable to me as Mayor, and are not acceptable to my administration, and are not acceptable to the people of Atlanta. Today, the overall situation is under control.... Let no one underestimate our resolve to maintain peace and order in the greatest City in this country. Simply stated, we will not tolerate lawlessness in any form. We will respect the

constitutional rights of everyone, but we will act forcefully, constitutionally, within the law, to prevent any more violence and destruction.

Upon the Mayor's request, Police Chief Eldrin Bell was also present at the conference and indicated that there were sufficient police forces in Atlanta, and that the lawlessness would not be tolerated. Plaintiffs were watching the live press conference on their television above the store. After being informed that students were surrounding a building, Chief Bell saw video of the attack of the Five Star Liquor Store on television during the news conference. Chief Bell answered a few more questions and then left to return to the scene as Mayor Jackson continued on with the press.

By 6:45 p.m.,[2] which appears to be about the same time that the press conference ended, members of the crowd began throwing rocks and breaking into Five Star Liquor Store. From his position in the police helicopter, Officer S.F. Patterson advised other officers over TAC I radio that approximately fifty to seventy-five students were vandalizing a small business at Elm and Fair.[3]

**2.** The exact timing of the series of events as the violence escalated in the mob outside Plaintiffs' stores is contested.

**3.** The TAC I radio transcript that both parties have submitted into evidence shows the following transmissions:

6:45 p.m. Dispatcher reports that "a call just came in from around Fair and Roach, about 50 college students assaulting a subject up in that area." Air 5, who is in the helicopter above the intersection, confirms.

6:46 p.m. Air 5 indicates that the mob is tearing the steel grating of a building on the north east corner of Elm at Fair Street. Unit 4 (Deputy Chief Derico) instructs Unit 10 (Major Mock) "get your people to deploy," and instructs Unit 11 (Major Holley) to "find Unit 10 and make sure he knows whats [sic] going on."

6:47 p.m. Unit 94 [sic] identifies this building as a liquor store. Air 5 indicates that the mob gained entry and is vandalizing the store. Unit 10 states that he is walking to the intersection now.

6:54 p.m. Unit 2901 (Captain J.R. Spence) states "[w]e need to throw a little gas down there and break this crowd up before they loot these stores." To which Unit 10 responded "We need to get these yellow busses out first."

6:59 p.m. Unit 100 (Captain Ferguson) announces "They are looting that, uh, at Fair and

Elm the liquor store there." Unit 11 responded, "Received, we're gonna [sic] have to get in that mini precinct for some items." Unit 100 indicated, "You're gonna [sic] have to go through a group of about 50 to 75 down there, looting that store to get there."

7:01 p.m. Air 5 informs Units 10 and 11 that mob has started on the Five Star Market one building east of the liquor store. Unit 10 tells dispatcher that the forces are at Fair and Walnut but "we're gonna [sic] move down on one minute."

7:02 p.m. Unit 1 (Chief Bell) arrives at Northside and Fair and calls in Units 11 (Mock) and 4 (Derico) to meet there as soon as possible.

7:06 p.m. Air 5 indicates mob has successfully entered and begun looting the Five Star Market.

7:08 p.m. Dispatcher asks if any units are located in the area of 595 Elmwood Road by the Five Star Market. Air 5 replies "That's gonna [sic] be a negative, there are no units in the vicinity of this area, it's still surrounded by about 100 students, the nearest units are at Walnut and Fair."

7:13 p.m. When Unit 10 requests dispatcher to call to see if owner is still in the grocery store, dispatcher answers that owner is in store.

7:14 p.m. Unit 1 asks if someone is in the store and then upon receiving an affirmative answer

Between 6:46 p.m. and 7:02 p.m., Plaintiffs proceeded to call 911 for assistance five times.[4] In the course of these five calls, the emergency 911 operator appeared to have difficulty understanding the caller, but indicated about seven to eight times that the police were on their way there. The TAC I transcript clearly indicates that the dispatcher reported a call originating from around the Fair and Roach intersection indicating that about fifty college students were assaulting a subject there at 6:45 p.m. During the next ten to twenty minutes, the mob gained entry to the liquor store, removed cases of alcoholic beverages, and broke into the supermarket. Around 7:15 p.m., a dispatcher actually called the Plaintiffs at the request of Major Mock and Chief Bell in order to advise them to remain out of sight of the crowd below. Within minutes of the last phone conversation with 911, the mob discovered Plaintiffs and chased them onto the roof of the grocery store approximately fifteen feet above the street. Plaintiffs barricaded the door onto the roof, but were assaulted by the crowd on the street who threw bricks, rocks, stones, and items stolen from their own store, hitting Mrs. Park, and shouted racial epithets at the Plaintiffs. Mr. Park also threw items at the crowd below.

In its May 1, 1992 edition, *The Atlanta Constitution* had run a headline that announced "Downtown Will Be Secure Today, Mayor Promises." Plaintiffs had believed that the city would not allow protests to develop into riots or destruction of property when they went to work and opened their business. Furthermore, based upon the information received from the 911 call, the earlier presence and statements of the police officers in the area, the statements that Mayor Jackson and Chief Bell made at the press conference, and the fact that officers never warned Plaintiffs to leave the area, Plaintiffs stayed at the store.

states, "Let's move in quickly as you can, toward the rescue."
7:16 p.m. Dispatcher gets owner on the phone.
7:17 p.m. Unit 1 begins to direct various units to the scene.

4. Defendants have admitted that Plaintiff called at 6:46, 6:49, 6:54, 6:59, and 7:02.

### B. *The Response of the City*

On the next morning after the demonstrations began, Mayor Maynard Jackson[5] and his staff met with various city officials and officials from the four universities to discuss police protection of the campuses on April 30, 1992. Mayor Jackson also met that day with students on the steps of City Hall, on the Morehouse campus, and during a prayer vigil at the Martin Luther King Center in an effort to calm their anger and to encourage them to condemn the verdict in a non-violent manner using a "three-point program" of "ballots, books and the buck."

When Chief Eldrin Bell[6] returned to Atlanta from his vacation out of the country on May 1, 1992, he met with Mayor Jackson at City Hall to discuss what had occurred on the previous day and to devise a strategy aimed at preventing the students from marching downtown again. Officials for the City of Atlanta met with various governmental agencies, and elected to use police forces available from outside the City of Atlanta to assist the Atlanta Police Department. The agencies included the Georgia State Patrol, the Georgia Bureau of Investigation, and the Georgia Department of Corrections. Chief Bell served as the overall commander of the forces. In the absence of Chief Bell, Deputy Chief Derico, who was the Field Operations Commander, was in charge, followed by Major Mock, who was the commander of the Special Operations Section.

The goal of these forces, which was highly publicized by the media, was to secure the downtown area and to prevent rioting in Atlanta. Thus, the forces were not to allow marches or groups of protesters to pass beyond Northside Drive. During the morning hours of May 1, police began stationing themselves at the intersections in the downtown area and around the perimeter of the campus, and created a staging area at the

5. Maynard Jackson was serving his second term as Mayor of the City of Atlanta, which ran from January 3, 1990, to December 31, 1993.

6. Eldrin A. Bell served as Chief of Police of the Atlanta Police Department from August 20, 1990, until his retirement on April 29, 1994.

intersection of Fair Street and Northside Drive.

The President of Clark Atlanta University, Dr. Cole, was upset about the presence of police on campus, because it appeared to incite some of the protesting students. After the tear gas incident near the dormitory, Chief Bell decided to move the major part of the law enforcement force away from the Atlanta University complex, eastward on Fair Street to Roach Street, one to two blocks east of Brawley. Thus, by 6:00 p.m., Chief Bell ordered the officers to move back to the staging area. It appears that some officers may have remained at strategic locations on the perimeter instead of moving to the staging area. One hundred to two hundred persons roamed Fair Street with some individuals following the police who were retreating up Fair Street past Plaintiffs' stores.

At about 6:45 p.m. when he learned of the assault up Fair street, Deputy Chief Derico instructed Major Mock, who was in charge of the ground support operations, to "get your people ready to deploy." About the time that some of the rioters broke into the liquor store, several hundred police officers were assembling approximately one to one and one-half blocks up Fair Street.

At 7:01 p.m., Officer Patterson announced over TAC I radio that the rioters had begun attacking the grocery store. As Chief Bell was returning from the City Hall press conference at 7:02 p.m., he instructed Major Holley to meet him at Northside and Fair Streets. Chief Bell then rode in the police helicopter over the mob to survey the attack of the grocery and liquor stores. While the police helicopter did not have any tear gas on board to disperse the crowd, about 150 to 200 Georgia State Patrol officers under the direction of Lieutenant Colonel Coleman were equipped with tear gas and riot gear and ready to head to the scene from the park at Northside and Fair Street. *See* Coleman Aff. at ¶¶ 4–5. Chief Bell did not call on them immediately.

At 7:13 p.m., Major Mock inquired over TAC radio whether anyone was in the grocery store. When Chief Bell overheard the dispatcher inform Mock about the Plaintiffs being trapped inside the apartment, he in-structed Mock to maneuver the forces to the scene.

The S.W.A.T. activity report estimated that the team was ordered to clear Fair Street in order to rescue the Koreans at approximately 7:00 p.m. Major Mock directed seventy-five officers beginning with Trooper Coleman's unit to march in two strategic wedges down Fair Street while other units approached from the Elm Street side. At approximately 7:21 p.m., Chief Bell ordered Deputy Chief Derico to have the Georgia State Patrol drop tear gas at the intersection of Fair and Elm. By 7:30 p.m., the S.W.A.T. Team rescued the Plaintiffs.

On May 4, 1992, Mayor Jackson and Chief Bell participated in another press conference in which they addressed the previous days' events and apologized to the Korean community, but also emphasized how none of the Atlanta University students were injured. Mayor Jackson also recognized the black community's long-standing resentment of the Korean business community and recommended that a symbolic gesture be taken such as a collection for the destroyed businesses.

## II. LEGAL DISCUSSION

Plaintiffs have stated federal claims under four provisions of the civil rights statutes, 42 U.S.C. §§ 1981, 1983, 1985(3), and 1986, as well as state claims under the Georgia Constitution, state tort law and various city ordinances. Defendants have moved for summary judgment as to Plaintiffs' entire complaint, while Plaintiffs have asserted a cross-motion for partial summary judgment for their negligence claims and their conspiracy claims under 42 U.S.C. §§ 1985(3) and 1986, and on the issue of the City's sovereign immunity. Also before this court are Defendants' unopposed motions to correct factual misstatement made by Plaintiffs in their reply brief [62–1], and motion to strike or in alternative to object to affidavit of Goldhagen [61–1].

### A. *42 U.S.C. § 1983*
#### *1. Due Process*

■ To establish a claim under § 1983, a plaintiff must show that the defendants acted

under color of state law to deprive plaintiff of a right secured by the Constitution or federal law. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Plaintiffs are alleging that Defendants are liable under § 1983 for violating Plaintiffs' substantive due process right for protection of person and property under the Fourteenth Amendment by failing to send immediate assistance to disperse the mobs attacking Plaintiffs' businesses after Defendants withdrew the police forces from the area.[7]

■ Recognizing that ordinarily nothing in the law of substantive due process requires the state to protect us from the deprecations of our fellow citizens, *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 195, 109 S.Ct. 998, 1002–03, 103 L.Ed.2d 249 (1989), Plaintiffs here try to make a case that the acts of the city created a "special relationship" which would make a failure of the city to protect them actionable. Plaintiffs fail, however, to establish either a special relationship or a failure to protect of constitutional dimension.

Relying upon *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir.1987), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), *Cornelius v. Town of Highland Lake, Ala.*, 880 F.2d 348, 352–53 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990), and the cases cited therein, Plaintiffs assert that Defendants created a special relationship imposing a duty to protect the Plaintiffs: (1) by making public announcements as reported in the newspaper and at press conferences that lawlessness would not be tolerated or that the downtown would be safe, (2) through demonstrating a strong police presence in the downtown and Atlanta University Center area, and (3) through express assurances to Plaintiffs by the 911 operator that help was on the way.

Yet, the two primary authorities upon which Plaintiffs lean will not support their case.

*Taylor* recognizes that the state owes a duty to a child it placed in foster care, following on the well-established obligation of the state to take care of those whose liberty the state has taken. *Taylor*, 818 F.2d at 797; *see Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 127, 112 S.Ct. 1061, 1069–70, 117 L.Ed.2d 261 (1992). Here, the city did not deprive Plaintiffs of their liberty or limit their freedom of action. Plaintiffs were free not to come to work that day if they so chose, and they could have left their stores when the police began to retreat late in the afternoon.

*Cornelius* might have been helpful to Plaintiffs if it were not doubtful that *Cornelius* is still binding in this circuit after the *Collins* decision. In *Cornelius*, the court found that a city owed a duty to the town clerk who as a condition of her employment had to work in the proximity of a prisoner cleaning squad who abducted her. *Cornelius*, 880 F.2d at 355. The court posited the duty in part on the idea that the city had subjected her to a special danger. *Id.* at 356–59. Yet, three circuit panels have expressed doubt regarding the viability of *Cornelius*. *See Lovins v. Lee*, 53 F.3d 1208, 1211 (11th Cir.1995) (citing *Wooten v. Campbell*, 49 F.3d 696, 700 n. 4 (11th Cir.1995), and *Wright v. Lovin*, 32 F.3d 538, 541 n. 1 (11th Cir.1994)).

Furthermore, although the circuit in its recent decision of *Skinner v. City of Miami, Fla.*, 62 F.3d 344 (11th Cir.1995), did not expressly overrule *Cornelius*, the circuit abandoned any pretense of following the opinion. There, the city had notice that certain of its firefighters had engaged in aggressive and distasteful hazing of co-workers in the past. *Skinner*, 62 F.3d at 347 n. 2. Despite this knowledge, the court determined that the shocking treatment that the plaintiff received at the hands of the firefighters did not implicate the deprivation of a constitu-

---

7. Plaintiffs also attempt to rely upon Article I, § 2, ¶ 2 of the Georgia Constitution, which provides that "protection of person and property is the paramount duty of the government," and upon the Atlanta Police Department Standard Operating Procedures, to establish Defendants'

duty to protect persons and property. However, such reliance is misplaced in light of the fact that only the Constitution can create substantive due process rights. *See Wright v. Lovin*, 32 F.3d 538, 540 (11th Cir.1994) (citing *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir.1994)).

tional right; rather, the treatment constituted a state law tort. *Id.* at 347.

In *Collins,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1993), a city employee died of asphyxia after he entered a manhole to unclog a sewer line. *Id.* at 117, 112 S.Ct. at 1064. Petitioner said that the event had occurred because the city had failed to train the employee in the dangers he faced in carrying out his work. *Id.* Clearly the city was responsible for placing that employee in a position of special danger, but the Supreme Court found that providing government workers with a safe place of employment was not a component of substantive due process. *Id.* at 126, 112 S.Ct. at 1069. Instead, the Court placed its focus upon whether the government was using its power in an abusive or oppressive manner. *Id.* at 126–29, 112 S.Ct. at 1069–71. In the instant case, Plaintiffs are not even in an employment relationship with the city so that it might be argued that the city's economic power was akin to a custodial situation.

At best, Plaintiffs are holders of the city's gratuitous promise to protect them. Recently, the Fourth Circuit had to consider whether promises create a special relationship; the court concluded that they do not. In *Pinder v. Johnson,* 54 F.3d 1169 (4th Cir.1995), the mother sued a police officer on behalf of the estates of her three deceased children. She had summoned the police because a former boyfriend was assaulting her in her home. *Id.* at 1172. After an officer made the arrest, the plaintiff told the officer that his subject had just been released from a sentence for arson of her residence previously. *Id.* The defendant promised that the subject would not be released that day on bond, and so the mother went to work. *Id.* The ex-boyfriend, however, was released that day; he returned and burned the plaintiff's home. *Id.* Her children died in the fire. *Pinder,* 54 F.3d at 1172. While determining that the plaintiff had shown no "special relationship," the Fourth Circuit stated that an individual is free to make her own judgments and act on them. *Id.* at 1175. Only in true custody situations is the freedom lost, and it is only then that the special relationship can come into being. *Id.*

Defendants in the instant case were not responsible for creating the mob's violence in the wake of the Rodney King verdict or directing it toward Plaintiffs or their businesses. The city did give assurances and Plaintiffs acted on these assurances, but the city did not limit the Plaintiffs' freedom of action, and that is what prevents this from arising to a constitutional violation.

■■■ Even if it could be said that the city did create a special relationship, it is doubtful that Plaintiffs could survive summary judgment on the issue that the city failed to give adequate protection. When the city moved its officers from their post between the colleges and Plaintiffs' businesses, the city did not abandon the sector. In the confusing climate resulting from the unruly horde's advance down Fair Street—replicating the aura that Karl von Clausewitz best described as the "fog of war," the police attempted to organize their response. While at least fifteen minutes elapsed in this process, the city clearly did respond to this activity and achieved Plaintiffs' rescue before severe personal injuries occurred.

Assuming *arguendo* that a special relationship existed, Plaintiffs would have to show that the city was deliberately indifferent to their situation. Compare *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), and *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The city moved its corps of officers to a nearby staging area in an effort remove a source of agitation. The city did appreciate the danger to Plaintiffs and maintained a strong presence a block and a half away. That the strategy did not provide Plaintiffs with a barrier of badges between their stores and the students proves neither that it was ineffectual nor that it was the product of intentional reckless. Thus, deliberate indifference cannot be shown.

### 2. Equal Protection

While Defendants did not owe a duty to protect Plaintiffs, Defendants could not "selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney,* 489 U.S. at 197 n. 3, 109 S.Ct. at 1004 n. 3

(citing *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)); *Wright v. City of Ozark,* 715 F.2d 1513, 1516–17 (11th Cir.1983). Plaintiffs assert that Defendants knew of Plaintiffs' alienage, were well aware of and encouraged the racial animus harbored by the black community against the Korean community, and understood that Plaintiffs and their property were an almost certain target of mob violence upon moving the police cordon two to three blocks beyond Plaintiffs' businesses. In essence, Plaintiffs contend that Defendants made a conscious decision to sacrifice Plaintiffs by withdrawing the police forces and by withholding the protective services of the police based upon their nationality in violation of the Equal Protection Clause.

■ In order to establish its equal protection claim, Plaintiffs must establish that the Defendants acted with discriminatory motive or purpose. *Id.; see also Cross v. State of Alabama,* 49 F.3d 1490, 1507 (11th Cir.1995) (citations omitted). While the court is mindful that it must draw all reasonable inferences in favor of Plaintiffs at this stage of the litigation, based upon the court's review of the record, the court cannot determine that Plaintiffs have established a factual issue that Defendants' actions were motivated, even in part, by a discriminatory animus.

In support of their allegation that Defendants had knowledge of Plaintiffs' national origin, Plaintiffs rely upon the following evidence. First, Plaintiff Kwang Jun No testified that he was acquainted with many of the police officers who worked in the mini-precinct across the street, that his store received its liquor license to sell alcoholic beverages through the Atlanta Police Department, and that the sixty to seventy officers witnessed the Plaintiffs close up their stores and lock themselves into the supermarket. No Aff. at ¶¶ 4, 8. Glenn Park also averred that he spoke to a number of officers in the vicinity that day regarding the riots and his family's safety. *See* Park Aff. Second, Major Watson Holley, who commanded the Zone One forces, stated during his deposition that prior to the riots, he knew that the owners of the Five Star Supermarket were "of Oriental nationality" and assumed that the owners of the Star Liquor Store were also "Oriental." Holley Dep. at 89. Third, Chief Bell passed through the area to confer with Chief Deputy Derico and, according to Plaintiffs, should have viewed the boarded up windows of Plaintiffs' stores. *See* Bell Aff. at ¶¶ 9–10. Fourth, a police officer prepared an incident report on the black students' vandalism of Plaintiffs' store on April 30, 1992. Fifth, Plaintiffs have alleged that the person speaking to the emergency 911 operator was speaking in broken English. Finally, the S.W.A.T. Activity Report for Demonstration Activities for the Period of April 30—May 3, 1992—which it appears was prepared, possibly by Captain Spence, after the riots—indicates that "local ministers had advised police personnel that the Korean store had been vandalized, and looters had trapped the Korean storeowners on the roof" at about 6:00 p.m. on May 1, 1992. *See* Plaintiffs' Motion for Partial Summary Judgment, Exhibit 12.

■ Based upon the court's review of the record, however, the court does not find any evidence that the key commanders and decision-makers, including Chief Bell, Deputy Chief Derico, Major Mock, or even Mayor Jackson, considered, mentioned, or even were aware of Plaintiffs' nationality. Rather, the record only appears to contain undisputed evidence to the contrary. For example, Bell, who made the decision for the forces to retreat, has averred that "[n]obody at the University said anything to me about the Five Star Supermarket or the Star Liquor Store; or did these businesses have anything to do with my decision to retreat." Bell Aff. at ¶¶ 11–12. According to his affidavit, Bell was unaware that people were inside the stores or that they had been attacked on the previous day when he was out of town, and only learned that Plaintiffs were Korean after their rescue in the evening of May 2, 1992. *Id.* at ¶¶ 10, 18, 28. Mayor Jackson has also stated that he did not discuss the Five Star Supermarket, the Star Liquor Store, or persons of Korean descent or their businesses with Chief Bell or any law enforcement officials, or with any of the students during the relevant time frames. *See* Jackson Aff. at ¶¶ 4, 6–10. In their depositions, other officers have also denied either

knowing or discussing the nationality of the owners of the stores under attack at the time of riots. *See* William H. Briley Dep. at 41–43; Derico Dep. at 173. Finally, although Major Holley or other officers working about the neighborhood precinct may have known that the owners were Korean, no evidence indicates that they relayed or discussed this information with their superiors, including Mock, Derico, Bell, or even Jackson.

In the absence of evidence that Defendants were motivated by a racial or discriminatory animus, an element upon which Plaintiffs bear the burden at trial, the court GRANTS the motion for summary judgment with respect to an equal protection claim in violation of 42 U.S.C. § 1983.

### B. *42 U.S.C. § 1981*

Plaintiffs appear to rely upon the language of § 1981 that extends to all persons "the same right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *See Lim v. Central DuPage Hospital*, 871 F.2d 644, 645 (7th Cir.1989). As this court discussed in its order of March 31, 1994, this claim is indistinguishable from Plaintiffs' equal protection claim brought under § 1983. *See Park, et al. v. City of Atlanta, et al.*, No. 1:93–CV–0952–JOF (N.D.Ga. March 31, 1994) (granting in part and denying in part Defendants' motion to dismiss). Because Plaintiffs have failed to demonstrate requisite proof of discriminatory intent, *see Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 679 (9th Cir. 1993), the court GRANTS Defendants' motion for summary judgment on the claim alleging a violation of 42 U.S.C. § 1981.

### C. *42 U.S.C. § 1985(3)* [8]

■ Plaintiffs allege that Defendants conspired to withdraw necessary police protection from Plaintiffs so as to allow the mob to attack Plaintiffs' stores. In order to establish a claim for conspiracy under § 1985(3), Plaintiffs must prove the following elements: (1) a conspiracy (2) for the purpose of deny-

ing any person or class of persons equal protection; (3) an act in furtherance of the conspiracy; and (4) an injury to a person, his property, or the deprivation of any right or privilege belonging to citizens of the United States. *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986); *see also Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627 (11th Cir.1992); *Smith v. Turner*, 764 F.Supp. 632, 636 (N.D.Ga.1991).

As with a claim alleging a violation of equal protection, the intent to deprive one of equal protection must contain some racial or otherwise class-based invidiously discriminatory animus behind the conspirator's actions. *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 1000 (11th Cir.1995); *Byrd*, 783 F.2d at 1007–08. However, as discussed above, the evidence does not establish that Defendants Bell or Jackson, or other commanding officers, including Major Mock and Deputy Chief Derico, were aware of the race of the owners of Plaintiffs' stores until after their rescue.

Plaintiffs thus argue that circumstantial evidence may establish their *prima facie* case of conspiracy. *See Burrell v. Board of Trustees of Ga. Military College*, 970 F.2d 785, 789 (11th Cir.1992); *Arnold v. Bd. of Educ. of Escambia County, Ala.*, 880 F.2d 305, 317 (11th Cir.1989). Plaintiffs point to conflicting explanations for the withdrawal of the police forces, which according to Plaintiffs, also violated the Atlanta Police Department's standard operating procedures for civil disturbances, and to the arguably unreasonable lapse of time before Defendants sent forces to aid Plaintiffs. In addition, without providing any supporting legal authority, Plaintiffs assert that they may establish the existence of a conspiracy through Defendants' failure to produce relevant information in the course of this litigation.

■ Assuming *arguendo* that Plaintiff has established an invidious discriminatory intent in this manner, Plaintiff still has failed to establish a principal element of this claim, the existence of a conspiracy to violate Plain-

---

**8.** Plaintiffs presumably plead conspiracy to deprive them of their equal protection rights also under § 1983. No separate consideration of such a claim is necessary in this order because such a claim is duplicative of the § 1985(3) claim.

tiffs' constitutional rights. Conspiracy requires proof "that there was an agreement to accomplish an illegal act. It is not enough for it merely to establish a climate of activity that reeks of something foul." *United States v. Wieschenberg*, 604 F.2d 326, 332 (5th Cir. 1979);[9] *see also Bailey v. Bd. of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1122 (11th Cir.), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992). The only evidence that the court possibly could construe as indicating the existence of an agreement or understanding to withhold protection from Plaintiffs is contained within the affidavit of television reporter Patrick Crosby. Specifically, Crosby averred that after the press conference of May 1, 1992, "various city officials" advised him of a determination made by the city to maintain a perimeter despite the ongoing attacks on Plaintiffs' businesses. *See* Crosby Aff. at ¶ 8. It appears to the court, however, that as the "various city officials'" statements are out-of-court statements offered to prove the truth of the matter asserted, these statements fall squarely within the definition of hearsay. *See* Fed.R.Evid. 801.[10] In the absence of an applicable hearsay exception, this court may not consider inadmissible hearsay testimony included in an affidavit or deposition to defeat a motion for summary judgment. *See Greensboro Professional Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir.1995); *Thomas v. International Business Machines*, 48 F.3d 478, 485 (10th Cir.1995); *see also United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir.1994) (concluding district court erred by considering inadmissible evidence in support of motion for summary judgment).

Although evidence does indicate that Chief Bell, Mayor Jackson, and other officials conducted meetings and used police radio to discuss the students' protests and developments in the riots, and that Mayor Jackson urged students to vent their frustrations through non-violent means, nothing in the record mandates the inference that these individuals ever sought to pursue illegal objectives or reached an agreement thereof during these discussions. *See Wieschenberg*, 604 F.2d at 331–36 (refusing to find conspiracy when mere discussions were susceptible to an interpretation of either legal or illegal activity). Finally, the court is unable to reconcile Plaintiffs' claim that the city allegedly agreed to withhold all protection to the Korean-owned stores with the city's sound response of sending in an entire corps of officers equipped in riot gear and employing tear gas to disperse the rampant mob. Thus, in the absence of evidence to prove a conspiracy for the purpose of denying any person or class of persons equal protection, Plaintiffs' § 1985(3) claim also fails. Defendants' motion for summary judgment is therefore GRANTED.

### D. 42 U.S.C. § 1986

Section 1986 provides a cause of action against anyone who has "knowledge that any of the wrongs conspired to be done and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing in the commission of the same, neglects to do so." Because § 1986 is derivative of § 1985, Plaintiffs cannot establish a violation of § 1986 without establishing a violation of § 1985. *Mian v. Donaldson, Lufkin and Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993); *Galloway v. Louisiana*, 817 F.2d 1154, 1159 n. 2 (5th Cir.1987). As discussed above, Plaintiffs have not shown that they can meet these burdens at trial. Accordingly, the court GRANTS Defendants' motion for summary judgment on the § 1986 claim.

---

9. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

10. Arguably, the statement of the "various city officials" might constitute an admission by party-opponent pursuant to the hearsay exemption found in Fed.R.Evid. 801(d)(2). The proponent of the evidence, however, has not produced sufficient evidence regarding the identity of the parties making the statement, the circumstances in which it was made, or other information to enable this court to determine that the admission was made by an agent acting in the scope her employment. *See* Fed.R.Evid 801(d)(2) Advisory Committee's Notes.

 

### E. *State Law Claims*

 Plaintiffs' remaining claims allege a due process violation under the Georgia Constitution and negligence causes of action arising under Georgia law and city ordinances. Because these claims fail to meet the jurisdiction requirements for diversity jurisdiction under 28 U.S.C. § 1332, the court does not have independent subject matter jurisdiction over the remaining state law claims within Plaintiffs' complaint. Pursuant to 28 U.S.C. § 1367, the court uses its discretion to decline to exercise supplemental jurisdiction over these pendent claims. Thus, the court DENIES the parties' motions for summary judgment on Counts Four through Twelve.

### F. *Defendants' Motions to Strike the Goldhagen Affidavit and to Correct Factual Misstatements of Plaintiffs*

Defendants first move to strike or alternatively to object to the affidavit of Harold B. Goldhagen on the basis that Plaintiffs failed to comply with the Local Rules in timely identifying Mr. Goldhagen as an expert witness [61–1]. Because Plaintiffs did not disclose Mr. Goldhagen as an expert witness in their Mandatory Interrogatories and delayed until ten days before the close of discovery to do so, Defendants assert that they did not have adequate time either to depose Mr. Goldhagen or to obtain their own expert witness. Plaintiffs oppose this motion in light of the fact that Defendants did not depose a single witness during the discovery period and waited over a month after Plaintiffs notified Defendants about Mr. Goldhagen to request his deposition. Upon the court's review of these matters, this motion is hereby DENIED.

Second, Defendants have moved for leave to file a motion, a brief in support, and three exhibits correcting two allegedly unsubstantiated statements made by Plaintiffs, regarding whether an Atlanta University official was involved in the conspiracy and whether Defendants adequately investigated the attack of Plaintiffs' stores [62–1]. In light of the wealth of materials submitted by both parties in support and in opposition to these cross-motions, this motion is DENIED.

### III. CONCLUSION

For the above stated reasons, Defendants' motions to correct factual misstatements made by Plaintiffs [62–1], and to strike or in the alternative to object to the affidavit of Harold B. Goldhagen [61–1] are DENIED; Defendants' motion for summary judgment [45–1] is GRANTED in part and DENIED in part; and Plaintiffs' motion for partial summary judgment [43–1] is DENIED.

Accordingly, the court DIRECTS the clerk to DISMISS WITH PREJUDICE Counts One, Two, Three, and Four, which include Plaintiffs' claims under the federal civil rights statutes discussed above. Because the court declines to exercise supplemental jurisdiction on the remaining state law claims, the court DIRECTS the Clerk to DISMISS WITHOUT PREJUDICE Counts Four through Twelve of the complaint so that Plaintiffs may refile in state court.